## Sheatler License

*R. Eugene Eves*, for appellant.

*Nickolas B. Piazza*, for Commonwealth.

KREISHER, P. J., August 2, 1957.—This matter comes before the court on appeal from the action of the Pennsylvania Game Commission in revoking the hunting license privileges of appellant for a period of

two years beginning September 1, 1957, and ending August 31, 1959, in compliance with the act of assembly in such cases made and provided.

The matter was heard de novo in open court, the testimony transcribed and filed and the facts developed are as follows:

On October 27, 1956, a farmer in Montour Township notified the game warden thereof that a man fired a shot at a ring-necked pheasant while it was within a safety zone or while it was within 150 yards of his buildings. The automobile license number of the hunter was given to the warden and thereafter, the warden found the car being driven just a short distance from the scene.

After the warden stopped the car and told the driver of the alleged offense, it was agreed that they would return to the scene. Upon examination it was determined that the bird, after crossing the highway, was running into the field in a crippled condition at or very near the outer edge of the safety zone when the hunter shot it. Thereupon the warden charged the hunter with "disturbing wild life in a safety zone" and advised him of his rights to have the matter heard before a justice of the peace or pay a field fine to the warden of $25. The hunter agreed to the latter procedure and the report thereof was sent into the Game Commission at Harrisburg.

The warden in telling of the violation stated:

"Q. Calling your attention to the month of October, 1956, I ask you whether or not during that month you had occasion to have some dealings with Albert L. Sheatler?

"A. I did.

"Q. Please tell us the circumstances under which you came in contact with him?

"A. On the 27th day of October I had a telephone call from one of our farm game coöperators that a man

had shot in a safety zone. The safety zone is established on these farm game projects within 150 yards of the farmer's buildings, and we, in order to promote better hunting, tell the farmer that we will enforce the law in reference to this safety zone, if he allows the Game Commission the hunting rights on his farm, and the balance of the farm shall remain open for public hunting. I had this telephone call that a man had shot in his safety zone, and he gave me a car license number which he had obtained. Later that day I apprehended a car, and found this car just a short distance from where this particular farm was; and Mr. Sheatler, when I stopped him I drove in front of his car and told him what had happened. I said, 'This is the story: The farmer called and said you did shoot in the safety zone, and perhaps we had better go down—it is only a short distance—and you show me just what happened.' So we went down to the point of the shooting; at least to where Mr. Sheatler said the shooting was, and I think that he said a ringneck crossed the highway and he shot, and it was in the safety zone, or just to the edge of it; in fact it was in the safety zone. I said, 'Mr. Sheatler, you can settle on a field acknowledgement, or you can have a hearing.' I said, 'I'll charge you with disturbing wild life in a safety zone.' Mr. Sheatler readily agreed and right there paid the penalty of $25, and I gave him a field receipt.

"Q. Was that field receipt signed byMr. Sheatler?

"A. That was signed by Mr. Sheatler, in my presence. He acknowledged what he had done.

"Q. Did you make a report of the violation to the Game Commission?

"A. I did. We have to make a report on all violations.

"Q. Do you have a record of any other violation by Mr. Sheatler up to that time?

"A. No."

In December of 1956, the same hunter paid a field fine under the following circumstances as testified to by another warden as follows:

"Q. Mr. Hagenbuch, calling your attention to the month of December, 1956, I ask you whether or not during that month you had occasion to have a conversation with Mr. Sheatler regarding a law violation?

"A. I did.

"Q. Where did this violation occur?

"A. In Hemlock Township.

"Q. Suppose you tell us what transpired.

"A. This violation, I had no knowledge of it until the complaint of a farmer in Hemlock Township wrote to Harrisburg; stated in his letter that the defendant in this case had shot into his car and into his building; had shot within 150 yards of his buildings, damaged his car, broke three windowpanes in firing. It was some time, possibly within ten days, before I received this complaint through channels.

"I went to see the farmer where this alleged violation took place, talked with him, examined his car, examined the barn where he claimed he had shot into it, and measured the distance 150 yards from the farthest building on his property; found that the defendant was out of the 150 yard zone, well beyond it; found that the defendant was not on the complainant's property; he was on the property of another farmer. There was a hedgerow between the defendant and the farm claiming the damage. I had no personal knowledge or sight of any of it. I then contacted the defendant on the first day of December. The complainant in his letter stated the defendant was using high-powered shells. I talked to the defendant on the first of December. He voluntarily showed me his hunting shell vest. He was not in possession of any high-powered shells. He stated he was hunting on the farm of his brother-in-law, approaching this hedgerow, some estimated distance of

25 yards or more from the hedgerow the dog raised a pheasant. He fired one shot at it; and that was all the shooting that was done. He then went to the residence of his brother-in-law, or relation, on his farm, and the complainant arrived there about the same time and charged him with this violation. The defendant's statement to me at that time was that he asked the man to take him down and show him the damage, which he refused to do. The complainant demanded, of course, that some action be taken in this case, and I stated to the defendant what his rights and privileges were. As I said, there was only one charge that could be legally brought against him in this case, and that was the damaging of property while hunting. I stated to him that he was certainly entitled to a hearing before a Minor Judiciary, who was a Justice of the Peace, or that he could settle with me immediately on the field, acknowledging his guilt, the same as he settled the other case. He than asked for a couple days to think this over, whether he wanted a hearing; and it was granted. He came to my residence, my office, a few days later and decided that he did not wish to run the chance of losing a working day on a trip, and that he would settle on a field acknowledgment for damaged property. Other than that, I have no interest.

"Q. Did you go to the premises of the complainant in this case and examine his property alleged to have been damaged?

"A. Yes, sir.

"Q. What did you see with regard to the property represented to be damaged?

"A. On the automobile, which the complainant was washing along side of the barn, I found two marks on it, possibly an inch and a half apart; could have been caused by shots; I don't know; black, discolored.

"I could not state positively it had been hit by shot. On the side of the barn, about a foot above the car, I

found one shot grain flattened out, sticking in the side of the barn. Three windowpanes, up ten feet or more in the barn, had small breaks in them, one I believe in the corner and a couple along the side, next to the putty. Whether or not they were broken by shot I could not tell.

"Q. Mr. Hagenbuch, did you make a report of this violation to the Game Commission?

"A. I did.

"Q. Did Mr. Sheatler pay his fine?

"A. He did."

Appellant testified that he is a resident of the Borough of Millville, this county, 40 years age with more than 20 years' hunting experience without ever having any previous violations of The Game Law. He further explained that complainant in the Columbia County case was his landlord for some years prior to the alleged offense and when demand was made for an increase in rent, he moved from the premises of the complainant and since that time has been on unfriendly terms.

He stated he was hunting at the time of the alleged violation on the farm of his brother-in-law, who is a neighbor of complainant, and even though the distance from the place he stood when he shot to complainant's buildings was so great that his shot could not have possibly done the damage alleged, he paid the penalty to keep his brother-in-law and complainant on friendly terms.

He also called expert witnesses who testified pellets from a shot and gun similar to the one he used could not have possibly done the damages claimed at the admitted distance.

The Game Law of June 3, 1937, P. L. 1225, art. III, sec. 315, subsec. 1, 34 PS §1311.315-1 provides:

"(1) The commission may revoke any hunter's license and deny any person the right to secure a license or to hunt or trap anywhere in this Commonwealth,

with or without a license, if said licensee or person has either been convicted or signed an acknowledgement of violating any provision of this act, or if such person has been adjudged guilty, in the manner hereinafter provided, of any of the acts enumerated below, for such periods as hereinafter specified."

The Act of August 19, 1953, P. L. 1081, sec. 2, subsec. 3(a), 34 PS §1311.315-3(a) provides:

"(3) Such license revocations shall be for the following periods:

"(A) For the first offense, any person convicted or having signed an acknowledgment, subject to a right of appeal, of violating any of the provisions of this act may be denied the right to hunt or trap anywhere in this Commonwealth, with or without a license, for a period of not to exceed three years. Any person convicted or having signed an acknowledgment of a second or subsequent offense of violating any of the provisions of this act may be denied the right to hunt or trap anywhere in this Commonwealth, with or without a license, for a period of not less than two or more than three years. For the third offense of violating any of the provisions of this act such person shall be denied the right to hunt or trap anywhere in this Commonwealth, with or without a license, for such period as the commission shall determine."

The Act of June 3, 1953, P. L. 270, sec. 1, subsec. 6, 34 PS §1311.315-(6) provides:

"(6) Any person whose license has been revoked by the commission for any of the aforesaid offenses shall have the right to file a petition within thirty (30) days after being notified of such revocation for a review of the matter in the court of common pleas of the county of legal residence of the licensee in the case of resident, and in the court of common pleas of Dauphin County in the case of a non-resident, which courts are hereby

vested with jurisdiction, and whose duty it shall be to set the matter down for hearing upon thirty (30) days written notice to the director, and to determine whether the petitioner is subject to revocation of license. The commission, when such appeal is taken, shall file with the prothonotary a certified record of the complete proceedings in the matter, including a certified excerpt of the resolution of the commission. The matter shall be heard de novo by a judge or judges of the court without a jury."

Counsel for the Commonwealth introduced into evidence a certified copy of the proceedings held before the Game Commission on April 6, 1957, at which time it was resolved and unanimously carried by the commission that the above quoted provisions of the act of assembly be declared mandatory and that the hunting license privileges of any persons falling within the aforesaid provisions be revoked in accordance with the said act, and it appearing that appellant having signed and paid two field receipts, that his hunting license privileges be revoked for a period of two years.

Under date of April 30, 1957, the executive director of the commission mailed appellant notice of this action and this notice was received on or about May 2, 1957, in accordance with subsection 6 of the act above quoted.

Appellant on May 29, 1957, by his attorney, filed with the court a petition for review at which time an appropriate order of court was entered in accordance with the said act fixing a hearing de novo for July 1, 1957, at 11 a.m.

From the resolution introduced into evidence it appears that the commission has construed the above quoted act of assembly to be mandatory and that the facts of the violation are not inquired into and the commission automatically carries out the provisions of the act of assembly without in any manner exercising any

discretion in the matter. This conclusion is apparent from the said resolution which reads as follows:

"37. License Revocations (Convictions) — Under authority of Article III, Section 315 of the Act of June 3, 1937, P. L. 1225, as amended, and/or the mandatory provisions of Section 731 of the Act of June 3, 1937, P. L. 1225, as amended, it having been proved that certain persons (1) have either been convicted of a violation of the Game Laws, or signed acknowledgment of guilt; or (2) have been guilty of, while hunting or trapping, mutilating or carrying away notices posted by the Commonwealth, or doing damage to livestock or other real or personal property, or having caused a forest fire, or of being intoxicated while using firearms, or bows and arrows, for the purpose of hunting; or (3) have been convicted or signed acknowledgment of guilt of a second or subsequent offense of violating any of the game laws; it was moved, seconded and unanimously agreed to revoke the hunting license of each of the persons below listed, and to deny each of them the right to secure a hunter's license or to hunt or trap anywhere in this Commonwealth, with or without a license, until after the date indicated opposite each name, effective beginning with September 1, 1957; and the Executive Director is hereby directed to send a written notice to that effect to each of these persons at his or her last known address, either by registered mail or delivered in person by a representative of the Commission; and to send through the Department of Revenue to its several agents who may be authorized to issue hunters' licenses a list, in writing, giving the name, address, and term for which such persons have been denied the right to secure a license or to hunt or trap anywhere in this Commonwealth, together with such other data as may be deemed necessary".

An examination of the above quoted Act of August 19, 1953, P. L. 1081, sec. 2, indicates that the legislature did not intend to make the provisions of the act mandatory, but rather discretionary, as the act provides that the action of the commission is subject to the right of appeal and that the license revocations *may* be made by the commission and does not provide that such revocation *shall* be made by the commission. In other words, from the wording of the above quoted resolution, it would appear that the commission has set up an arbitrary rule of procedure with a foregone conclusion irrespective of the attendant circumstances. If the legislature had intended this result, it is the court's opinion that they would have used the directive "shall" in the act rather than the discretionary word, "may".

Also, subsection 2 of the original act provided that the matter be referred to a referee who shall conduct a hearing to determine the action to be taken after a full inquiry of the facts. True, the later amendments do not require this procedure, but subsection 2 was not repealed and this indicates the legislature intends the action to be discretionary and not mandatory and this procedure might still be followed.

It seems to follow therefore, that on appeal, the legislature has given to the court of common pleas the right to review the circumstances of the case, and exercise its judicial discretion to determine whether the revocation by the commission was warranted or merely an arbitrary conclusion reached from an established course of conduct.

We have in this appeal two admitted field receipts signed by appellant but the circumstances under which both of these acknowledgments were signed are so unusual that in the exercise of the court's discretion, we are forced to conclude that the fixed action of the commission was not warranted in this particular case.

In the first offense in Montour County we have involved a crippled bird moving through the wet grass at or near the very outer edge of a safety zone. The signs establishing this safety zone are many yards apart, are not necessarily in a direct line and have no line of demarcation between the signs, and since as we understand the testimony, the hunter, when he fired the shot, was well beyond the safety zone and the bird was at or near the very outer edge of the safety zone, it is conceivable that this hunter, though not exhibiting the careful rules of safety that he perhaps should have exhibited, made an honest mistake in his judgment and even though he acknowledged his guilt by the payment of a field receipt, it, for the purposes of revocation of his license, could in our opinion be considered an excusable mistake.

In regard to the other violation the court is satisfied from the testimony and from his personal experience in the field that this alleged violation was engendered out of ill will and not on substantial credible evidence. From the testimony there is a grave element of doubt as to whether or not appellant actually committed a violation of any of the game laws or acts enumerated thereunder, and therefore, it is our opinion that his generosity in endeavoring to cement friendly relationships should not be used to penalize him.

Therefore, without further discussion in the matter and in the exercise of the judicial discretion which the legislature has reposed in the court, we are inclined under the particular circumstances of this case to sustain the appeal, and our review of the matter indicates that the arbitrary action of the commission without a hearing in the matter must be set aside and to this end we make the following:

*Order*

And now, to wit, August 2, 1957, the appeal from the revocation of the hunting license of Albert L.

Sheatler is sustained, the order of the Pennsylvania Game Commission revoking the hunting license privileges of the said Albert L. Sheatler for the period from September 1, 1957, to August 31, 1959, is hereby set aside and the costs of this proceeding are placed upon the Commonwealth of Pennsylvania.

And now, to wit, August 2, 1957, upon motion of Nickolas B. Piazza, Esq., attorney for the Commonwealth of Pennsylvania, an appropriate exception is noted and a bill sealed.